FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ JAN 29 2016 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
TEVIN ROWE,

                       Plaintiff,

         - against -

COMMISSIONER OF SOCIAL SECURITY,

                       Defendant.
------------------------------------------------------------ X

<u>**MEMORANDUM DECISION AND ORDER**</u>

13 Civ. 1268 (AMD)

**ANN DONNELLY, District Judge.**

       The plaintiff Tevin Rowe challenges the Social Security Commissioner's determination, after a hearing before an Administrative Law Judge ("ALJ"), that he is not disabled for purposes of receiving Supplemental Security Income ("SSI") under the Social Security Act. The case is before me on the parties' cross-motions for judgment on the pleadings pursuant to Federal Rules of Civil Procedure 12(c). For the reasons explained below, the Commissioner's motion is granted, and the plaintiff's motion is denied.

## BACKGROUND

       The plaintiff, born in 1990, was determined to be disabled in 2004 and thus eligible, as a child, for SSI.[1] Following his eighteenth birthday, the Social Security Administration ("SSA") reviewed the plaintiff's case to determine his eligibility for SSI under the disability rules for adults.

---

[1] The plaintiff's childhood SSI eligibility was based on the determination that his speech and language delays functionally equaled Section 111.04 of the Listing of Impairments. See Tr. 19, 108, 523–27.

1

On March 13, 2009, the SSA notified the plaintiff that under the adult standards for disability, he was not disabled, and thus was no longer eligible for SSI as of March 2009.[2] He appealed and after a hearing, the hearing officer also concluded that the plaintiff was no longer disabled and could work. The plaintiff then requested a hearing before an Administrative Law Judge. ALJ Lori Romeo held a hearing on December 12, 2011, at which the plaintiff appeared with counsel. Following that hearing, she found that under the adult disability standards, the plaintiff was not disabled as of March 1, 2009, or at any time through the date of her decision. This decision became the final decision of the Commissioner on February 14, 2013, when the Appeals Council denied the plaintiff's request for review. This appeal followed.

**EVIDENCE PRIOR TO REDETERMINATION UNDER ADULT STANDARDS**

The plaintiff was first diagnosed with a learning disability in 1996 when he was about six years old. Tr. 558. He began receiving special education services in 1997, including placement in a dedicated class for students with disabilities in 1998. Tr. 558.

In the academic years that followed the plaintiff was evaluated by a number of different professionals.[3] According to those evaluations, the plaintiff had significant delays in reading, vocabulary, spelling and mathematics, and performed "severely" below his grade level. Tr. 320–21. He scored in the low end of the low average intelligence scale on his IQ tests, receiving a verbal IQ score of 74, a performance IQ score of 91 and a full scale IQ score of 81. Tr. 327.

A 2007 vocational evaluation administered by Nadia Jeanty revealed that the plaintiff had difficulty following directions, was easily distracted, had difficulty differentiating between

---

[2] In a redetermination of disability at age eighteen, the individual's disability typically ends "[t]he month the evidence shows that you are not disabled under the rules in this section, but not earlier than the month in which [the SSA] mail[s] [the individual] a notice saying that [he] [is] not disabled." 20 C.F.R. § 416.987(e).
[3] I reviewed reports from Radha Giridharan, M.D., Tr. 583–84; The Stanley S. Lamm Institute for Child Neurology and Developmental Medicine, Tr. 466–70; Lafayette High School, Tr. 205–08; Speech Therapist Deanna Pandolfini, Tr. 349–50; Dr. Shaheen Khalid, MD, Tr. 214–15; Vocational Rehabilitation Counselor Nadia Jeanty, Tr. 297–300; Vocational Rehabilitation Counselor Robert Padgett, Tr. 190–99; and Individualized Education Program reports.

important and unimportant information, and was capable of only simple tasks "with adequate time and repetition." Tr. 298. As a consequence of these limitations, the plaintiff had "very few general or personal skills" that were transferrable to new job situations. Tr. 298. The plaintiff expressed an interest in training and placement for jobs that involved manual labor, and he was certified for vocational rehabilitation services. Tr. 299.

Following his graduation from high school with an Individualized Education Plan Diploma in 2008, the plaintiff participated in a three-week diagnostic vocational evaluation process. Vocational rehabilitation counselor Robert Padgett reported that during these evaluations, the plaintiff's mathematics, reading and language skills were still far below his grade level, Tr. 192; on the other hand, he was able to work independently, could focus on some assigned tasks and could follow certain directions. Tr. 190. While he was unable to complete clerical tasks because of his "poor work pace," he performed reasonably well on assigned manual tasks, scoring in the average to above average range. Tr. 190. He was referred to vocational training in a skilled manual trade, such as custodial or building maintenance. Tr. 190.

## REDETERMINATION UNDER ADULT STANDARDS

Beginning in 2009, the plaintiff underwent evaluations to determine his eligibility to receive SSI benefits as an adult. During that time, he was seen by at least eight different professionals in various capacities.[4] There is no dispute that the plaintiff was found to be significantly learning disabled, performing well below grade level in reading and in mathematics. Intelligence testing again placed him within the lower limits of the borderline range of

---

[4] I reviewed reports from Heidi Van Horne, Psy. D., Tr. 407–11; SSA Psychologist Dr. Y. Burstein, Tr. 388–90, 391–404; Vocational Rehabilitation Counselor Marlene Meltz, Tr. 301–04; Speech Therapist D. Pandolfini, Tr. 336–43; Dr. Aurelio Salon, Tr. 217–19; Dr. Susan Lotto, Ph.D., Tr. 221–26; Dr. Irene Chow, D.O., Tr. 241–58; and Dr. John Laurence Miller, Ph.D. Tr. 256–62.

3

intellectual potential; his scored a verbal IQ of 69, a performance IQ of 77 and a full scale IQ of 70. Tr. 222.

Heidi Van Horne, Psy. D. diagnosed the plaintiff with a learning disorder after a consultative evaluation in February 2009. In addition to deficiencies in reading, writing, and mathematics, Dr. Van Horne found mild impairment of memory skills; testing revealed that "[h]e was able to state 3 out of 3 objects immediately, but 0 out of 3 objects after five minutes. He was able to state 5 digits forward and 2 digits backwards." Tr. 409. She concluded that the plaintiff's prognosis was good given that he had completed high school and had strong family support. Tr. 410.

In a March 2009 assessment of the plaintiff's mental residual functional capacity, SSA psychologist Dr. Y. Burstein concluded that the plaintiff was moderately limited in his abilities to follow instructions, maintain concentration, perform activities on a schedule, maintain a routine without supervision, respond to changes in work settings, set realistic goals independently, and perform at a consistent pace without unreasonable rest periods. Tr. 388, 388A. Around the same time, vocational counselor Marlene Meltz assessed the plaintiff's potential for training in custodial or shipping and handling jobs. She reported that the plaintiff "is motivated to work, and eager to get started."[5] Tr. 303.

The plaintiff's speech therapist D. Pandolfini reported in a May 2009 teacher questionnaire to the SSA that in addition to pronounced difficulties with mathematics and reading, the plaintiff has an obvious problem comprehending oral instructions, a serious problem understanding school and content vocabulary, and a very serious problem learning new material and recalling and applying previously learned material. Tr. 337. However, the speech therapist

---

[5] Otherwise, Ms. Meltz's review seemed to derive almost entirely from the plaintiff's prior participation in the October 2008 DVE, conducted by vocational rehabilitation counselor Robert Padgett.

4

indicated that the plaintiff had no problem paying attention when spoken to directly, sustaining attention during play or sports activities, and carrying out single-step instructions. Tr. 338.

Dr. John Laurence Miller, Ph.D., performed a consultative evaluation in May 2011 and diagnosed the plaintiff with a reading disorder and borderline intellectual functioning. Tr. 256–62. Dr. Miller observed that the plaintiff has trouble learning new tasks, performing complex tasks independently, and making appropriate decisions. Tr. 258. Dr. Miller concluded that these difficulties are caused by cognitive defects, which "may significantly interfere with the claimant's ability to function on a daily basis," including his ability to manage money. Tr. 258. Dr. Miller stated that the plaintiff's ability to understand, remember, and carry out simple instructions is mildly restricted; his ability to make judgments on simple work-related decisions is moderately restricted; and his ability to understand, remember, and carry out complex instructions is markedly restricted. Tr. 259.

As a consequence of the above-described cognitive limitations, the plaintiff had pronounced difficulties with complex tasks, including remembering and following instructions and making judgments about complex matters. He was, however, capable with only mild restrictions, of understanding and following simple directions, sustaining concentration for simple tasks, and adapting to simple changes. Moreover, the plaintiff had no difficulty interacting appropriately with others in a work setting.

As far as daily living skills, the plaintiff took care of his own personal hygiene, had friends, and spent his time socializing, playing video games, watching television, drawing and playing basketball. Tr. 409. He also enjoyed parties and going to clubs. Tr. 222. Although his mother managed his money and did most of the shopping, the plaintiff was able to do laundry and could sometimes go shopping on his own. Tr. 242. He could also use public transportation

as long as he did not travel far from home. Tr. 257. He did not exhibit any thought disorders, and was respectful and cooperative. Tr. 339. He was, though, susceptible to negative peer pressure due to his impressionability and poor social judgment. Tr. 223.

The plaintiff participated in a job training program as a maintenance man. He arrived on time to his job, was "very functional" and had no behavioral problems. Tr. 164.

## PHYSICAL EVALUATIONS

The plaintiff was in reasonably good health. He was the victim of an apparently random shooting in August of 2011, and suffered a bullet wound to his ankle. Tr. 71. He had surgery to remove the bullet, spent one night in the hospital, and was instructed to avoid heavy lifting and strenuous exercise for six to eight weeks following his discharge, and to plan for rest periods during his daily routine. Tr. 71. Although he suffered from asthma as a child, it had been years since he had suffered any kind of episode, and had no history of hospitalization. Tr. 217. Nonetheless, he was directed to avoid smoke, dust, and known respiratory irritants. Tr. 219. In 2008, he hurt his knee while playing basketball, but did not require surgery or any kind of long term treatment. Tr. 481.

## HEARING TESTIMONY

The 21 year old plaintiff testified at the hearing. Tr. 615. His testimony about his daily living skills was largely consistent with the findings of the professionals who had evaluated him: that he was able to perform a variety of tasks independently, including some household chores, daily grooming, shopping, and limited cooking with a microwave. Tr. 612–17. He played video games and searched the internet. Tr. 613. He socialized with friends, and had had a girlfriend for a time. Tr. 614. He went outside every day and took public transportation independently. Tr. 156, 615.

The plaintiff believed that he would not be able to get a job because of his learning disability. Tr. 609. He once applied to work at Luna Park, but was unable to complete a written test; he also felt that he would not have been "good at operating the rides." Tr. 619–20. He had, however, worked in the Summer Youth program in July and August of 2006 and 2007, and participated in the STEP program in 2009 and 2010. Tr. 608.

Vocational Expert Melissa Fass-Carlin also testified at the hearing. Tr. 620. Ms. Fass-Carlin's practice focused on people who had physical injuries and limitations, and not typically with intellectually disabled people. Tr. 622–23. The ALJ asked her to assume a hypothetical English-speaking person, born on August 18, 1990, with no work experience and a functional education at the marginal level, and to opine whether there were any jobs in the national or local economies that the hypothetical person could perform. Ms. Fass-Carlin replied that the person could work as a cleaner (79,178 jobs in the local economy; 1,058,365 in the national), a hand packager (10,318 jobs in the local economy; 162,992 in the national), or a meat clerk (2,300 jobs in the local economy; 69,583 in the national). Tr. 621–22.

## THE ALJ'S DECISION

The ALJ determined that the plaintiff's disability had ended on March 1, 2009, and he had not become disabled again since that date. In reaching her decision, the ALJ utilized the sequential evaluation process set forth in the Code of Federal Regulations. 20 C.F.R. § 416.920. Under that analysis, the ALJ considered the following: whether the plaintiff has any severe impairments, whether those impairments meet the severity of the listed impairments in Appendix

1,[6] and whether, despite those impairments, he could perform work that exists in significant numbers in the national economy.[7]

Applying these standards, the ALJ concluded that the plaintiff had borderline intellectual functioning and asthma. The ALJ determined that the plaintiff's asthma did not have a significant impact on his ability to work, and thus was not severe.

While recognizing that the plaintiff's intellectual limitations were severe, the ALJ found that they did not meet the requirements of the statute. In applying Section 12.05 of Appendix I, which governs intellectual disabilities, the ALJ found that the plaintiff was not completely dependent on others for "personal needs." Rather, he was able to manage much of his daily living; he could dress himself, do certain chores, travel with a degree of independence, and he socialized with other people. Further, the plaintiff's reading and mathematics scores demonstrated that his aptitude in those areas could be measured.

Moreover, while the plaintiff had valid verbal, performance, or full scale IQ scores between 60 and 70,[8] his intellectual disability was not accompanied by an additional physical or other mental impairment that imposed "an additional and significant work-related limitation function." Nor did the plaintiff's intellectual disability result in any "marked restriction" of his daily living activities, social functioning, or maintaining "concentration, persistence or pace." And there were no "repeated episodes of decompensation."

Finally, the ALJ found that the plaintiff had "the residual functional capacity to perform a full range of work at all exertional levels," as long as the work was limited to the performance of "simple, routine, manual activities." Given his age, education, past work experience, the ALJ

---

[6] 20 C.F.R. § Pt. 404, Subpt. P, App. 1.
[7] Because the ALJ was conducting an age-18 redetermination, she was not to consider the plaintiff's work activity. 20 C.F.R. § 416.987(b). Here, the ALJ found that the plaintiff had no past relevant work.
[8] The plaintiff did not have a valid verbal, performance, or full scale IQ of 59 or less.

8

decided that the plaintiff could, with vocational assistance, perform work that exists in significant numbers in the national and local economies. Thus, the ALJ found that the plaintiff's disability ended on March 1, 2009.

## DISCUSSION

When a social security claimant challenges a finding of no disability, the "district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"). "Substantial evidence" is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Moreover, it is for the agency, not the court, "to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). Accordingly, once an ALJ makes findings of fact, the district court can reject those findings "only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original). The district court may not "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991).

Measured by these standards, the ALJ's decision was supported by the evidence, and she applied the correct legal principles in reaching her decision. She conducted a thorough fact finding that included the plaintiff's educational history, the results of intellectual and vocational evaluations, and testimony about the plaintiff's functional capacity from experts and from the

plaintiff himself. The plaintiff's arguments to the contrary do not undermine the reasonableness of the ALJ's decision.

For example, the plaintiff argues that the ALJ's review was not complete because she did not mention each piece of evidence that was presented in advance of the hearing; specifically, the plaintiff objects to the ALJ's decision not to cite the reports of four professionals who evaluated the plaintiff. Clearly, though, an ALJ is not required to discuss every piece of evidence, as long as she develops a full and fair record. *Brault*, 683 F.3d at 448 (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). Indeed, while the ALJ cannot "pick and choose" evidence in the record that supports her conclusion, *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004), her decision not to cite specific evidence does not mean that she did not consider the evidence. *Brault*, 683 F.3d at 448. In any event, the reports to which the plaintiff points did not conflict in any significant respect with the ALJ's ultimate decision. Because the evidence before the ALJ was sufficient to make a determination about the plaintiff's disability, she was not obligated to create a more extensive record. *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996); *see also Cichocki v. Astrue*, 534 F. App'x 71, 77 (2d Cir. 2013) ("because substantial evidence . . . supported his determination, the ALJ was not under a duty to further develop the record.").

The plaintiff's challenge to the qualifications of the vocational expert is equally unpersuasive. The ALJ enlisted Ms. Fass-Carlin to determine whether there were jobs in the national economy that the plaintiff could perform despite his limitations. Ms. Fass-Carlin concluded that there were such jobs, testimony on which the ALJ relied. The fact that Ms. Fass-Carlin did not work with people with intellectual disabilities did not, as the plaintiff claims, disqualify her from offering an opinion.

A vocational expert need not have experience in the placement of individuals with a claimant's *specific* disabilities or limitations. *See Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983) ("The vocational expert is just that, a vocational expert. The ALJ is responsible for determining, based on all the evidence, the claimant's physical capabilities."); *see also Aull v. Astrue*, No. 05-cv-1196-LEK-DEP, 2008 WL 2705520, at *17 (N.D.N.Y. July 10, 2008); *Uhlig v. Apfel*, No. 97-cv7629-SHS, 1999 WL 350862, at *11 (S.D.N.Y. June 2, 1999). Instead, vocational experts can provide insight into the types of jobs that people with certain impairments can perform, and the extent to which those jobs exist in the local and national economies. *Dumas*, 712 F.2d at 1554 n.4; *see also* Social Security Administration, Vocational Expert Handbook at 7 (June 2011), https://ssa.gov/appeals/public_experts/Vocational_Experts_(VE)_Handbook-508.pdf (a vocational expert is to have "up to date knowledge of, and experience with, industrial occupational trends and local labor market conditions.").

That is precisely what happened in this case. The ALJ posed a hypothetical to Ms. Fass-Carlin, asking that she assume a person with essentially the same history and intellectual capabilities as the plaintiff, a question to which the plaintiff's attorney did not object. Ms. Fass-Carlin, who had sufficient knowledge of the demands of occupations, the existence and incidence of jobs within those occupations, and the transferability of work skills, responded that the individual described in the hypothetical could work as a cleaner, a packager, or a meat clerk. The plaintiff's counsel did not pose any additional hypothetical questions to Ms. Fass-Carlin.

Under these circumstances, the ALJ's assessment of the plaintiff's residual functional capacity was based upon substantial evidence, and the hypothetical presented to the vocational expert was supported by the record. *See Harvey v. Astrue*, No. 5:05-cv-1094-NAM, 2008 WL

4517809, at *15 (N.D.N.Y. Sept. 29, 2008) (claimant's RFC is based on substantial evidence and thus the hypothetical posed to the vocational expert is supported by the record). The ALJ need not have further developed the record. The plaintiff is not eligible for SSI after a redetermination under the adult standards.

## CONCLUSION

For the reasons set forth above, I **GRANT** the Commissioner's motion for judgment on the pleadings, (ECF No. 33), **AFFIRM** the Commissioner's decision, **DENY** the plaintiff's cross-motion. (ECF No. 35), and **DISMISS** this action.

**SO ORDERED.**

                                                s/Ann M. Donnelly

                                                The Honorable Ann M. Donnelly
                                                United States District Judge

Dated: Brooklyn, New York
       January 29, 2016